Littleton, Judge,
delivered the opinion of the court.
The plaintiff is suing for an amount deducted by the Comptroller General from plaintiff’s account with the defendant. This amount represents the difference between freight charges on certain shipments paid by the Government at the commercial rate and freight charges on these shipments at a lower statutory rate which, the defendant contends, is the highest rate that should have been applied. The matter is before us for decision on the merits.
During the years 1944 and 1945 the United States Maritime Commission sold substantial quantities of scrap steel to the North Western Steel & Wire Company and the Inland Steel Company. This scrap metal was sent from certain West Coast shipyards to plants of the steel companies in the Middle West over the lines of various rail carriers including the plaintiff. It was scrap resulting from the Commission’s program to build ships, which were employed-almost entirely for military and naval use during the war. Over 90% of the shipments were to the plant of North Western Steel & Wire Company at Sterling, Illinois. This plant was engaged in the manufacture of steel ingots and steel products and it used scrap steel as the principal raw *441 material. The Maritime Commission shipments appear to have constituted only a small part of the total scrap used in the operations of the plant.
The Sterling plant had a steel ingot production of approximately 300,000 short tons per year; some ingots were sold as such, while others were made into a whole line of manufactured steel products. A certain part of the plant’s products were shipped out over the lines of the Chicago and North Western and the Chicago, Burlington & Quincy. Railway Companies. An analysis of these shipments indicates that less than 10% by weight went to military consignees. Furthermore, there is no evidence that the plant at Sterling or any other installation of the two steel companies was engaged in the performance of Government contracts.
The steel scrap was sent from the West Coast to the two steel companies pursuant to allocation orders of the War Production Board. The allocation system was set up by the Government to assure, as far as possible, that all steel mills would be kept running. The allocation orders in this case, unlike allocations issued to private dealers in scrap steel, contained a clause under shipping instructions which read as follows: “All material shipped shall be for resmelting purposes and for Military and Naval use only.” The War Production Board, however, had no control over allocations issued by it once the allocation was reported completed.
Title to the scrap was in the United States until sold and delivered; the purchase contracts carried the notation: “Material to be owned by shipper until delivery to us at Sterling, Illinois.” The Commission retained no control over the scrap after it was sold and delivered. The typical bill of lading for these shipments contained an endorsement by the United States Maritime Commission in these words: “Military or naval property of the United States moving for military or naval and not for civil use,” and an endorsement by the carrier as follows: “to avoid delay in transportation, carriers execute this bill of lading as prepared and tendered by the United States, but do not agree to notation thereon that the property shipped is military or naval property of the United States, moving for military or naval and not for *442 civil use.” Furthermore, testimony indicates that it was the policy of the Commission to make such notations for the purpose of taking advantage of land grant rates wherever possible.
We are of the opinion that under the facts of this case the plaintiff is entitled to recover. It is true that the scrap was the property of the United States until delivered; but the proof is insufficient to show that this was “military or naval property of the United States moving for military or naval and not for civil use.” Only such property was exempt from paying the full commercial rates under Section 321 (a) of the Transportation Act of 1940, 54 Stat. 898, 954 (49 U. S. C. 65, 1940 Ed.). Compliance by the plaintiff carrier with the provisions of Section 321 (b) of the Act is uncontested.
In Northern Pacific R. Co. v. U. S., 330 U. S. 248, the Supreme Court said, at page 254:
But in general the use to which the property is to be put is the controlling test of its military or naval character.
The facts clearly establish that the scrap was to be put to a predominantly civil use. It may well be that the plants here involved were doing work of importance to the defense of the country, but if that alone were a sufficient criterion a substantial distinction between military and civil uses could hardly ever be made in time of war. Nor does the fact that the scrap resulted from building ships for military or naval use make it (the scrap) property moving for military or naval use. The use to the military was, at most, very remote. The Supreme Court has thrown some light on this aspect of the case when it said in the above mentioned case, at page 254: “Military or naval property may move for civil use, as where Army or Navy surplus supplies are shipped for sale to the public.”
The unilateral declaration on the part of the Government that the cargo was moving for military or naval use was not sufficient to determine the question whether or not the cargo was actually so moving. This conclusion is strengthened by other considerations, although we do not think any one of them by itself is controlling. The Government had no effective control over the use of the materials after they had *443 been delivered. Nor did it have a very distinct knowledge of the use to which the scrap was to be put after delivery. The Government knew that there was a shortage of scrap steel in the Middle West and in the East and an oversupply on the Pacific Coast. The Government’s principal consideration in directing the movement of scrap steel in this case appears to have been to alleviate this condition. There is no evidence that other factors were given any material weight in assigning allocations.
All the foregoing arguments force us to conclude that the shipments here were not “military or naval property of the United States moving for military or naval and not for civil use” as those words are used in the Transportation Act of 1940, sufra.
The plaintiff is entitled to recover. Entry of judgment is suspended pending the filing either of a stipulation by the parties showing the agreed amount due or a report by the General Accounting Office showing the exact amount due.
It is so ordered.
Laramore, Judge; Madden, Judge; Whitaker, Judge; and Jones, Ghief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Marion T. Bennett, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff is a corporation duly organized and existing under the laws of the State of Wisconsin, and is engaged as a common carrier by railroad in the transportation of persons and property for hire in interstate commerce over its lines in participation with other common carriers. At all times herein mentioned, until June 1, 1944, Charles M. Thompson was the duly appointed and acting trustee of the property of the Chicago and North Western Railway Company in reorganization under Section 77 of the Bankruptcy Act, as amended, under authority of the District Court of the United States for the Northern District of Illinois, Eastern Division, in Proceedings for the Reorganization of *444 a Eailroad, in the Matter of Chicago and North Western Eailway Company, Debtor, No. 60448. As such trustee Thompson was engaged in the business of a common carrier of persons and property by rail for hire in interstate commerce over his lines of railroad in various States of the United States.
On June 1,1944, the plaintiff became vested with full title, possession and control of all of the assets of the trust estate of the Chicago and North Western Eailway Company, in said reorganization proceeding by an order of the District Court of the United States, Northern District of Illinois, Eastern Division, including the cause of action of said trustee against this defendant.
2. During the years 1944 and 1945 the plaintiff, in the ordinary course of its business, and with other participating carriers, transported large quantities of scrap steel from various points on the Pacific coast to destinations in the States of Illinois and Indiana on U. S. Government bills of lading. The transportation charges on these shipments were billed by the plaintiff, and originally were paid by the defendant, on the basis of the duly published commercial rates applicable to scrap steel between the points of origin and destination named in the bills of lading.
3. Subsequently, the General Accounting Office made a determination that the transportation charges above referred to should have been based on land-grant rates instead of on the published commercial rates as billed by the plaintiff and paid by the defendant. Thereafter, the General Accounting Office made deductions from the payment of moneys otherwise due plaintiff, in amounts sufficient to adjust the former payments from a commercial rate basis to a land-grant rate basis. The amount of the plaintiff’s claim in this case is the difference between the land-grant rates, as paid, and the applicable commercial rates as originally billed by the plaintiff.
4. Beginning in 1941 and during World War II the United States Maritime Commission acquired steel for the construction of ships at various shipyards on the Pacific coast for use during the last war. The steel scrap which resulted from the construction of these ships was owned by the United *445 States until sold and delivered as hereinafter stated. It is that scrap which is involved in this case.
5. During 1944 and 1945 and following War Production Board allocations, the Maritime Commission sold this scrap steel to North Western Steel & Wire' Company, Sterling, Illinois, and Inland Steel Company, Indiana Harbor, Indiana, f. o. b. Sterling and Indiana Harbor, respectively.
6. The steel scrap sold to the North Western Steel and Inland Steel Companies, as above stated, was shipped in carloads on Government bills of lading issued by the Maritime Commission, as stated in Exhibit A to the petition, from points on the Pacific coast in California and Oregon, to Sterling, Illinois, and Indiana Harbor, Indiana, respectively. The transportation service was performed by the plaintiff and other participating railroads, the plaintiff being the final and delivering carrier at Sterling and Indiana Harbor.
7. By stipulation, the plaintiff and defendant agreed that the following is representative of the bills of lading covering the shipments under consideration:
U. S. GOVERNMENT BILL OF LADING
No. MO 829712
Consignee: Northwestern Steel & Wire Company.
Destination: Sterling, Illinois.
Via: AT&SF C&S CB&Q C&NW.
Date Bill of Lading Issued: June 17,1944.
From (Shipping Point) : Bichmond, California.
From (Name of Shipper) : TJ. S. Maritime Commission, Washington 25,' D. C.
Issuing Office: Procurement Division.
Claim for loss or damage on this Bill of Lading is being handled by the U. S. Maritime Commission.
Name and title of issuing officer: E. J. Husted, Resident Material Controller.

Description, of Articles Weight Bate Charges

Scrap Steel_ 112,240 66^ per cwt. $740.78
(Endorsement by U. S. Maritime Commission:)
MILITARY OR NAVAL PROPERTY OF THE UNITED STATES MOVING FOR MILITARY OR NAVAL AND NOT FOR CIVIL USE.
(Endorsement by Carrier:)
TO AVOID DELAY IN TRANSPORTATION, CARRIERS EXECUTE THIS BILL OF LADING AS PREPARED AND TENDERED BY THE UNITED STATES^ BUT DO NOT AGREE TO NOTATION THEREON THAT THE PROPERTY SHIPPED IS MILITARY OR *446 NAVAL PROPERTY OF THE UNITED STATES, MOVING FOR MILITARY OR NAVAL AND NOT FOR CIVIL USE.
Certificate of Issuing Officer: Contract No. or Purchase Order No. or other authority for Shipment:
War Production Board
Allocation #32-92333
Signature of Issuing Officer: (s) Charles J. Reynolds,
Name of Transportation Company : Santa Fe Railway Date of Receipt of Shipment: September 20, 1944 Signature of Agent:
(s) H. Rex.
consignee's certificate of delivery — consignee must not pay anv CHARGES ON THIS SHIPMENT
Chicago & North Western Ry.
One hundred twelve thousand two hundred forty pounds scrap steel.
I certify that I have this day received from the transportation company named in this certificate the public property described in this bill of lading in apparent good order and condition and that delivery service at destination was not by the Government or its agent:
Northwestern Steel & Wire Company, (s) Jack Bowman, Director of Purchases.
8. Under the Transportation Act of 1940 land-grant deductions with regard to the transportation of Government property were abolished to the extent noted in the following excerpt from Section 321 (a) of the Act, 54 Stat. 898, 954, (Public Law No. 785, 76th Cong., 3d Session) :
* * * the full applicable commercial rates, fares, or charges shall be paid for transportation by any common carrier subject to such Act of any persons or property for the United States, or on its behalf, except that the foregoing provision shall not apply to the transportation of military or naval property of the United States moving for military or naval and not for civil use or to the transportation of members of the military or naval forces of the United States (or of property of such members) when such members are traveling on official duty; * * *
9. Prior to the time of the enactment of the above law and also subsequent thereto, one of the principal functions of the Maritime Commission was the construction of merchant vessels for use in carrying on the commerce of the United States. The vessels were also to be suitable for conversion into naval or military auxiliaries, for which funds had been *447 provided the Commission by provisions of the Merchant Marine Act of 1936, as amended.
In December 1942 the Maritime Commission decided that as of December 8, 1941, its function of shipbuilding for commerce became primarily a function of shipbuilding for war purposes and that, therefore, all of the material, etc., purchased by it for incorporation in the construction of vessels was military or naval property of the United States moving in transit for military or naval and not for civil use, and as such was entitled to be transported on the basis of land-grant freight rates where applicable. Proper officers of the Commission were directed and authorized to take any and all action necessary to obtain the benefits of the land-grant rates wherever applicable. This determination by the Maritime Commission is in the f orm of a resolution which reads as follows:
Whereas pursuant to the provisions of the Merchant Marine Act, 1936, as amended, the acts subsequent and supplemental thereto, funds have been made available to the Commission for the construction of merchant vessels of such types, size and speed as the Commission may determine to be useful for carrying on the commerce of the United States and suitable for conversion into naval or military auxiliaries;
Whereas the Commission, in carrying out the foregoing purposes, has procured and is procuring, either directly or through its agents and contractors, materials, equipment and supplies for use in the construction of such vessels on the basis of contracts or orders providing for passage of title and delivery to the Commission to such material, equipment and supplies at the point of manufacture thereof;
Whereas by Section 321, Part II, Title III of the Transportation Act of 1940, approved September 18, 1940 (Public No. 785, 76th Cong., 3d Session) land-grant deductions with regard to the transportation of Government property were abolished except with regard to the transportation of military or naval property of the United States moving for military or naval and not for civil use, and to the transportation of members of the military or naval forces of the United States (or property of such members) when such members are traveling on official duty;
Whereas prior to the entry of the United States into the present war on December 8,1941, there was no basis *448 for a determination by the Commission as of the time of transportation of any such materials, equipment and supplies that upon completion any particular vessel or group of vessels would be devoted primarily to the purposes of war rather than to the purposes of commerce; and
Whereas, subsequent to said date of December 8,1941, it became apparent that all merchant vessels then in the process of construction and thereafter to be constructed until the termination of the present war were to be devoted primarily to the purposes of war, rather than to the purposes of commerce, for the transportation of munitions and supplies for direct consumption by military and naval forces in the various theatres of war, and for the transportation of military and naval personnel to and from said theatres of war.
NOW, THEREFORE, BE IT RESOLVED THAT:
1. The Commission hereby finds and determines that, as of December 8,1941, all vessels then in the process of construction and thereafter to be constructed were to be devoted primarily to the purposes of war rather than to the purposes of commerce, and that all materials, equipment and supplies purchased by the Commission, its agents and contractors for incorporation in the construction of such vessels were, upon passage of title to the Government after said date of December 8, 1941, military or naval property of the United States and upon shipment moved for military or naval and not for civil use;
2. The proper officers of the Commission be authorized and directed to take any and all actions necessary and proper to obtain the benefit of land-grant freight rates wherever applicable in accordance with the provisions of Part II, Title III, Section 321 of the Transportation Act of 1940, on the basis of the action of the Commission as herein set forth.
Approved by the Commission December 4,1942
10. The action of the Maritime Commission in adopting the above resolution and in carrying out its purpose is not in question in the case herein presented except as to its applicability to the particular shipments involved. The resolution itself was revoked by another resolution dated July 2, 1946, effective September 1, 1945, the date of the formal surrender of Japan. It was also the general policy of the *449 Commission to take advantage of land grant rates wherever possible.
11. As stated in finding 4, the Maritime Commission procured the steel necessary for the construction of the ships and furnished it to the shipbuilders at various yards on the Pacific coast. Under its program of shipbuilding the Commission constructed approximately 5,600 ships which were used in shipping munitions and cargo for the war effort. After the ships left port they were under the control of Navy convoys and were used almost entirely for military and naval use during the war. Title to the unused portion of the steel used in the construction of the vessels, that is, the steel scrap, remained in the Maritime Commission until sold and delivered. It was accumulated in the west coast shipyards until the Commission determined that it was no longer needed and sold it as surplus scrap. The Commission retained no control over the scrap after it was sold.
12. During the war years steel scrap was under the control of the War Production Board, which, by a system of allocations, directed the flow of scrap steel so as to assure, as far as possible, that all steel mills would be kept running. These allocation directives controlled only the distribution of the steel scrap.
The Maritime Commission, acting through resident materiel coordinators, reported at regular intervals to the War Production Board the quantities of steel scrap which it had on hand in the various shipyards throughout the country.
13. The accelerated program of shipbuilding on the Pacific coast resulted in an oversupply of steel scrap in that part of the country in the late fall of 1943, whereas in the East and Midwest there was an insufficient supply to meet the needs of steel manufacturers. This condition resulted in a meeting between representatives of the War Production Board and the Maritime Commission in November or December of that year, at which time a program for the moving of scrap steel from all of the Pacific coast yards was agreed upon.
14. It was stipulated by the parties that the typical allocation order of the War Production Board, with relation to the shipments in question, contained the following shipping instructions:
*450 All material shipped shall be for resmelting purposes and for Military and Naval use only.
The above clause, however, was not placed on allocations issued by the War Production Board to private dealers in scrap steel for the moving of their stocks of the metal.
The War Production Board had no control over allocations issued by it once the allocation was reported completed.
15. Between March 8,1944 and August 23,1945, the Maritime Commission sold large quantities of scrap steel to North Western Steel & Wire Company and Inland Steel Company. The volume of such shipments, with their respective destinations, and the freight charges as originally billed by the plaintiff and paid by the defendant at the full applicable commercial rate of $0.66 per cwt., are summarized in the following table:

*451 16. It is not in evidence that the consignees of the above shipments were engaged in the performance of Government contracts, or that the sale of steel scrap to them by the Maritime Commission was conditioned on their use of the material for Government needs. Purchase contracts, however, carried the notation, “Material to be owned by shipper until delivery to us at Sterling, Illinois.”
Shipments, when received by the consignees, were stockpiled and commingled with similar scrap which had been purchased and received from sources other than the Maritime Commission. The quantity of scrap on hand and as received from other sources by the consignees above referred to during the period under review is not in evidence.
17. North Western Steel was engaged in the manufacture of steel and steel products. Its production of steel ingots was approximately 300,000 short tons per year, some of which were sold as such and without further processing. Its principal manufactured products included billets, blooms, rods, bars, nails, staples, tacks, fences, poultry-netting, wire mesh, reinforcing bars, gates, barbed wire, etc., which it sold to other manufacturers, warehouses, farm co-operatives, and hardware jobbers throughout this country and the world and to the United States Government for military and lend-lease purposes.
18. Neither the manufacturing nor sales records of the the North Western Steel & Wire Company are in evidence, having been destroyed, and it is not possible to determine either the extent of its manufacturing or the disposition of its products. None of its sales, however, were restrictive as to the purchasers’ use of the materials.
Distribution of products by North Western Steel, however, was effected generally as follows: 10 percent of its shipments moved out of the mill by truck, 90 percent by railroad, and of the rail shipments approximately Sy2 percent were less-than-carload. Seventy-five percent of its rail shipments out of Sterling, Illinois, were serviced by the Chicago and North Western Railway Company and 25 percent by the Chicago, Burlington and Quincy Railroad Company.
19. The plaintiff introduced into evidence tabulations which were prepared by its accounting department from *452 “Way-bills” and other railroad accounting records showing some, but not all, of the shipments of steel products made by the North Western Steel & Wire Company for the periods shown below. It is established that these tabulations represent shipments made by North Western Steel and that the consignees are its regular customers. Segregation of the shipments into the various categories was made by the plaintiff on the basis of the information shown on the documents which included the name of each consignee, the nature of the shipment and its destination. The accuracy of such classifications has not been established by further proof. Minor errors in plaintiff’s computations are corrected in the summary below.
Defendant does not contend that shipments were diverted in transit, but there is no conclusive evidence as to actual deliveries to the original consignees, or as to the disposition the consignees made of their purchases.

20. The pattern of the North Western Steel shipments did not alter greatly in the years 1948, 1944 or up to August 1945. However, with the termination of the war in August 1945, a lot of Government orders were cancelled, restrictive Government regulations were lifted, and the firm’s regular customers were allowed to buy products which had not been available to them under the wartime Government regulations.
*453 The tabulation set forth above does not purport to show the entire output of North Western Steel either for the period under review or for the period shown in the tabulation. It is offered by plaintiff as illustrative of the pattern of shipments made by the North Western Steel & Wire Company over plaintiff’s lines and the lines of the C. B. & Q. Kailroad, which, plaintiff contends, truly reflects the nature of the business conducted by North Western Steel at that time.
21. No similar data concerning the nature of Inland Steel Company’s business or shipments emanating from Indiana, Harbor, Indiana, are in evidence. It is not possible to determine how much, if any, of Inland Steel’s business was on Government contracts or otherwise, or how many, if any, of this company’s products were destined for the military or naval use of the United States.
However, Inland Steel Company’s purchases of scrap steel from the Maritime Commission in the period under review amounted only to 6% of the total shipments in question. The respective tonnage is as follows:

22. As previously noted, freight charges on the shipments of scrap steel sold by Maritime Commission to the North Western Steel and Inland Steel Companies were adjusted from the regular commercial rate of $0.66 per cwt. to a lower rate based on land-grant agreements.[1] Defendant effected this adjustment by making deductions from amounts otherwise due the plaintiff during the years 1948 and 1949. The amounts otherwise due plaintiff and the sums deducted therefrom in adjustment of the freight charges under discussion, as claimed by the plaintiff, are as follows:

*454

23. Steel was in short supply and scrap was an essential in its manufacture at the time in question. It is defendant’s position that the steel ships which were built by the Maritime Commission were used entirely for military and naval use during the war; that part of the Maritime Commission’s program of building ships was the disposal of scrap steel; that it was the intent of the resolution, adopted by the Commission and cited in finding 9, that scrap steel from the shipyards should be sent to mills for remanufacturing into steel, and that it was the policy and intent of the Commission that the shipments of scrap steel involved herein were moving for military purposes.
24. Plaintiff does not deny that the scrap steel under discussion was the property of the United States during its transportation and until delivered to the buyer, but it contends that such shipments were not “moving for military or naval and not for civil use”, as provided in Section 321 of the Transportation Act of 1940. It further contends that such shipments were intended to be and actually were for civil use and consumption. The evidence establishes that the steel scrap involved was placed in a common stockpile by the purchaser, commingled with similar material received from other sources and used in the manufacture of a variety of commodities which were sold to civilian customers.
25. Allocations issued by the War Production Board were directive with regard to the distribution of the scrap and not with regard to how the scrap moved or how it would be used. Control of the allocations did not extend beyond delivery of the shipment to the consignee.
There is no evidence that either the North Western Steel & Wire Company or the Inland Steel Company was engaged in the construction of ships, that either was engaged in the *455 performance of Government contracts, or that the products of either company were for military or naval and not for civil use; nor is it shown that the sale of scrap steel to them by the Maritime Commission was conditioned, qualified or in any way restrictive of their freedom to manufacture and dispose of their products.
26. The plaintiff and defendant agree, and have stipulated, that if the shipments were military or naval property of the United States moving for military or naval and not for civil use, within the exception contained in Section 321 (a), Title III, Part II, of the Transportation Act of 1940, the action of the General Accounting Office was proper and the deductions in question were properly made. The shipments were not military or naval property moving for military or naval use and the plaintiff is entitled to recover the difference between the land-grant rates paid by the defendant and the applicable commercial rates.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is entitled to recover.
Entry of judgment is suspended pending the filing either of a stipulation by the parties showing the agreed amount due or a report by the General Accounting Office showing the exact amount due.

 Neither the land-grant agreements nor the computations involved are in evidence.