CHICAGO, ROCK ISLAND and PACIFIC
RAILROAD COMPANY, A
Corporation

v.

The UNITED STATES.
No. 49213.

United States Court of Claims.
June 5, 1957.

Raymond A. Negus, Washington, D. C., Lawrence Cake, Washington, D. C., on the brief, for plaintiff.

James H. Prentice, Washington, D. C., with whom was George Cochran Doub, Asst. Atty. Gen., Paris T. Houston, Washington, D. C., on the brief, for defendant.

PER CURIAM.

This case was referred by the court to C. Murray Bernhardt, a commissioner of this court, with directions to make findings of fact and recommendations for conclusion of law. The commissioner has done so in a report filed December 4, 1956, containing together with his findings an opinion giving reasons and citing precedents holding that plaintiff is entitled to recover. The court having considered the evidence and the briefs and argument of counsel adopts the findings and opinion of Commissioner Bernhardt which are printed below. Plaintiff is therefore entitled to recover and judgment is entered to that effect. The amount of recovery will be determined pursuant to Rule 38(c), 28 U.S.C.A.

It is so ordered.

LITTLETON, Judge, dissents.

Opinion by the Commissioner

In Chicago and North Western Railway Company v. United States, 124 F. Supp. 359, 129 Ct.Cl. 439, it was held that shipments of scrap steel in 1944 and 1945 from surplus supplies accumulated by the Maritime Commission on the Pacific Coast to steel companies in the Midwest were not proven to be shipments of "military or naval property of the United States moving for military or naval and not for civil use" which, pursuant to section 321(a) of the Transportation Act of 1940, 54 Stat. 898, 954 (49 U.S.C.A. § 65), would be entitled to the application of land-grant rates for the transportation involved. Instead, the court concluded that the carrier was entitled to be paid at the full commercial rates. The instant case, with almost identical facts, is designed to test that result where the

record is expanded to include evidence of end use, a deficiency in the earlier case commented on so pointedly by the court as to suggest that evidence of ultimate use was of controlling importance.

During 1944 and 1945 the Maritime Commission sold to the Inland Steel Company, of Indiana Harbor, Indiana, and the Granite City Steel Company, of Granite City, Illinois, certain quantities of scrap steel which had been generated as surplus resulting from its World War II shipbuilding program on the West Coast. Plaintiff railroad, as the final delivering carrier of the scrap to the steel companies, charged and was paid for its transportation services at the full commercial rates. Subsequently, the General Accounting Office withheld from other sums due plaintiff an amount, claimed as an overpayment on the earlier transportation, representing the difference between the land-grant rate and the higher commercial rate. This is the sum in suit. Substantially all of the bills of lading which had been prepared by the Government to accompany the shipments contained an endorsement by the Maritime Commission that the scrap was military or naval property of the United States moving for military or naval and not for civil use. On most of the same bills of lading representing shipments to Inland Steel Company, but on none of those covering shipments to Granite City Steel Company, the originating carrier had endorsed its protest that in accepting the shipments for transportation it did not acquiesce in the shipper's description of the property. These endorsements of themselves do not control the outcome of the case. Chicago and North Western Railway Company v. United States, supra, 124 F.Supp. at page 361, 129 Ct.Cl. at page 442.

The scrap in question was in nationwide short supply. The surplus which had been accumulated by the Maritime Commission from its West Coast shipbuilding program was allocated by the War Production Board to the various steel companies according to their need and their relation to the war effort.

Without approval by the War Production Board it could not be sold by the Maritime Commission nor purchased from it. In its allocation orders authorizing the scrap shipments to Inland and Granite City, the War Production Board imposed the condition that "All material shipped shall be for resmelting purposes and for military and naval use only."

Concurrently, the War Production Board, by means of production directives, exercised rigid control over the production programs of the steel companies to insure that military needs would be satisfied before any except essential civilian needs could be met. A war economy was superimposed on a civilian economy, but the former prevailed where shortages existed. The production directives instructed the individual steel mills as to the quantities and types of steel which they were to produce from month to month, as well as the uses to which the steel was to be put and those to whom it was to be sold. In required monthly reports to the War Production Board each steel company reported the details of its monthly production. The report form provided an elaborate breakdown of monthly production which, by utilization of a symbol system and a classification of using agencies, made it possible for the War Production Board to readily determine which uses were being satisfied and to what extent the steel companies were complying with their production directives. Judicious use of the monthly reports filed on these forms by the steel companies provided a fair idea of the proportionate spread of materials which went to satisfy military, naval, and civilian requirements. The authority of the War Production Board over the steel companies, through its powers of allocation and production control, effectively precluded them from use of raw materials, such as the scrap steel in this case, in any manner other than that directed.

The steel companies were required by the Renegotiation Act of 1943 (50 U.S. C.A.Appendix, § 1191) to renegotiate their wartime contracts made with the War and Navy Departments, Treasury,

Maritime Commission, War Shipping Administration, Defense Plant Corporation, Metals Reserve Company, Defense Supplies Corporation, and the Rubber Reserve Company, the last four companies being subsidiaries of the Reconstruction Finance Corporation. The War Contracts Price Adjustment Board, which was charged with the administration of the Renegotiation Act, perceived that some steel companies would have difficulty in segregating their sales for renegotiation purposes. That Board issued a memorandum in March 1945 to producers of controlled steel products in which it described a method of segregation which would meet with approval as being obedient to the requirements of the Act. In brief, this method was keyed to the monthly reports of production by the steel companies to the War Production Board. While the Renegotiation Act did not directly state that sales for military or naval use were renegotiable, and that civilian sales were not, the segregation of sales subject to renegotiation by Inland Steel Company and Granite City Steel Company, pursuant to the advice in the memorandum, were made on that basis. The percentages of military and naval production reported by those companies for purposes of the Renegotiation Act were, and were intended to be, accurate reflections of the information they had previously reported to the War Production Board. In case of doubt as to which category a particular sale fell into, it was usually resolved in favor of being nonrenegotiable, so that the percentages of military or naval production reported by these companies could be regarded as a minimum.

Upon arrival of the scrap in question at the mills of the Inland Steel Company and the Granite City Steel Company, it was customarily sent directly to the open hearth furnaces, with little or no interval on the stockpiles. There it was mixed with proportions of pig iron and a smattering of other ingredients whose nature and quantities were dictated by the type of steel desired, and, after being melted and poured into molds, emerged in the form of steel ingots which, in turn, were converted into such intermediate forms as blooms, slabs, and billets, and thence into flat-rolled products such as plates, sheets, and strip, and form-rolled products such as structural shapes and rails. These forms and shapes were then sold to users for further fabrication. Upon introduction into the furnaces, the scrap lost its separate identity and it became impossible to trace it down to the finished products in which it was ultimately embodied. Even in those cases where the scrap may have been temporarily lodged in company stockpiles awaiting smelting, such was its handling as to cause it to lose its identity in almost the same degree. It was, in short, fungible property.

Granite City Steel Company's production of steel ingots in 1944 and 1945 was 488,200 tons and 392,400 tons, respectively. The Maritime Commission scrap steel with which we are concerned represented an insignificant fraction of the total amount of scrap used to produce these quantities. The company reported to the Renegotiation Act authorities that 60.4 percent of its total 1944 production and 65.9 percent of its production in the first eight months of 1945 was subject to renegotiation. These figures were based on dollar volume of sales, but they are a reasonably accurate reflection of the sales by weight as well. For reasons heretofore given, the same figures constitute the percentages of production in those periods which had military or naval end uses, as distinguished from civilian. Granite City Steel Company's signal contribution to the military steel needs of the nation consisted of steel plate, constituting 45 percent and 29 percent of its tonnage of ingot production in 1944 and 1945. Fully 47 percent of Granite City Steel Company's 1944 production was attributable to the leasing of additional plant facilities from the Defense Plant Corporation for the production of ingots and plate. The lease of these facilities, which were shut down in July 1945, was conditioned on their exclusive production of ingots and plates.

Inland Steel Company's comparable figures of ingot production in 1944 and 1945 were 3,684,147 tons and 3,507,686 tons. Again, the percentage of Maritime Commission scrap contributing to this production was minuscule. The company reported to the Renegotiation Act authorities the percentages of 63 percent and 47.151 percent as reflecting the proportions of their production for 1944 and the first eight months of 1945, respectively, which were subject to renegotiation. These percentages, for reasons already given, constitute the proportions of the company's production in those periods devoted to military or naval uses.

The pertinent language of the Transportation Act of 1940 upon which this controversy depends reads as follows:

"Notwithstanding any other provision of law, * * * the full applicable commercial rates, * * * shall be paid for transportation by any common carrier * * * of * * * property for the United States, or on its behalf, except that the foregoing provision shall not apply to the transportation of military or naval property of the United States moving for military or naval and not for civil use. *. * *"

The resolution of the legal issue presented would occasion no difficulty if the determination of the end use of the scrap in question as predominantly military or naval were to wholly control the result, but the parties agree that the intended use and the character of the property as military or naval *at the time of shipment* govern. Their disagreement centers on the extent to which the actual end use is to be considered as evidence of intention. If the plaintiff proves to be incorrect in its contention that the property was moving for civilian use, then a subsidiary question arises as to whether it is the expressed purpose of the shipper's intention which determines the character of the shipment or the extent to which that purpose is realized.

Plaintiff relies heavily not only on Chicago and North Western Railway Company v. United States, supra, but also on Northern Pacific Railway Company v. United States, D.C., 101 F.Supp. 29. In the former of these two cases, proceeding on facts closely analogous to the present ones, it is apparent that the finding for plaintiff rested on the absence of information in the record as to the character of the end use of the scrap after its transformation into products shipped by the steel mills to customers, and the court's repeated observation that the Government had no control over the scrap after its delivery to the mills. These deficiencies have been remedied in the instant case, where a precise percentage of the production of the steel mills has been found to be military or naval in character, and the uninterrupted control by the Government over the use of the scrap has been established. In the second of the two cases cited above, military scrap property, including surplus scrap iron arriving from overseas, moved in 1944 and 1945 from ports of debarkation to military salvage centers where, after inspection, some of it unfit for military use was sold as surplus for civilian use. During the time of its transportation to the salvage centers the court held it to be military property moving for military use, for it never lost its military status until it was declared surplus and allocated for civilian use. But that is not the case here. Merely by being declared surplus the scrap sold by the Maritime Commission to the steel companies had not completed its military mission, but rather was in an interlude between such uses. It was not unwanted surplus whose existence was the anxious concern of its owners and its disposal their problem. Nor was it, as plaintiff claims, sold as surplus to its purchasers with no conditions whatsoever and for their unrestricted use. On the contrary, it was subject to the unremitting control of war-serving government agencies from its inception under the Maritime Commission and through its allocation and use under the War Production Board allocation orders and production directives. At no time was this vigilance relaxed to permit the steel producers to

exercise their own judgment in diverting it to civilian production. Had the steel companies ventured to use it for purposes foreign to the allocation orders, or to depart from the rigid production directives under which they operated, they would have been subject to most stringent penalties. To say that the test of relinquishment of the Government's control is fulfilled by the fact that the interest of the Maritime Commission ended once the scrap was delivered to the mills, is to ignore the sequence of control by the War Production Board, and the equally cogent fact that both agencies in their correlated activities must be regarded as a unit for the purpose of determining whether there was even a momentary absence of direction over the end use of the scrap.

In determining whether property is military, naval, or civilian in character for the purpose of section 321(a) of the Transportation Act of 1940, the intention at the time of shipment can frequently not be ascertained without reference to the actual use and, in all but the exceptional case where the intention is thwarted by a misuse, the two should correspond. In effect, the ultimate use is mortgaged with the intention which existed at the time of shipment. Although the Supreme Court in Northern Pacific Railway Company v. United States, 330 U.S. 248, 254, 67 S.Ct. 747, 750, 91 L.Ed. 876, said that "in general the use to which the property is to be put is the controlling test of its military or naval character.", its later amplification in 330 U.S. at page 257, 67 S.Ct. at page 751, that "the controlling test is the use to which the property is dedicated or devoted.", retains the facts of ultimate use as an accurate measure of the intention. The plaintiff's further quotation from the last-named Northern Pacific case, "Military or naval property may move for civil use, as where army or navy surplus supplies are shipped for sale to the public.", is *dicta* and, in any event, does not apply here where the steel scrap was naval surplus which was shipped not for sale to the public so

much as shipped to private corporations for rededication to predominately military or naval use.

If the shipments of scrap steel were of military or naval property moving for military or naval and not for civil use, as has been found, is it then proper to apply the land-grant rate to the entire quantities shipped, as defendant maintains, or only to that portion of the scrap which can be estimated to have found its way into end products for military or naval use? In Pennsylvania Railroad Company v. United States, 125 F.Supp. 233, 129 Ct.Cl. 781, lend-lease shipments of plywood were sent to Britain in World War II on British requisitions disclosing separately the proportions of plywood to be used for military and civilian purposes. For the transportation to the port of embarkation the court found that the land-grant rate applied to that portion consigned for military use, and the commercial rate to the balance. If applicable, this presents an attractive solution to the scrap steel problem. Both scrap steel and plywood are fungible commodities. It would be scarcely less difficult to follow one than the other through the maze of fabrication processes down to its ultimate use. As a fungible commodity, plywood specifically designated for military use may well be substituted by identical plywood designated for civilian use, and no loss or detriment would result so long as in the end there is a sufficient quantity to fill the total of all requirements both military and civilian. So it is with scrap steel. The circumstances that plywood moved on requisitions clearly denoting the end use to be both military and civilian in known proportions, while the scrap moved on War Production Board allocations restricting it to military or naval use, does not render inapplicable the rule in the plywood case. The injunction as to the use of the scrap steel in the allocation orders of War Production Board (i. e., that it was for resmelting purposes and for military and naval use only) was not literally enforceable, for the manufacturing processes would preclude a permanent physi-

cal segregation of the scrap so that *all* of it would be embodied in military or naval products. The extent to which the scrap was to be used in civilian products was known, was measured by the relative proportions of military and civilian products permitted by the War Production Board production directives to the steel mills, was not affected by the apparently contradictory wording of the War Production Board allocation orders that it be used only for military or naval production, and must be considered to have been intended at the time of shipment to the steel mills. Thus, in both the plywood and scrap steel situations the shipper knew or should have known that only a percentage of each shipment would serve military needs.

Southern Pacific Company v. Reconstruction Finance Corporation, 9 Cir., 161 F.2d 56, 60, held that where benzol was shipped by the Government to a benzol stockpile accumulated for military purposes during World War II, and the War Production Board by its allocation orders permitted 13.4 percent of the stockpile to be used for civilian purposes, this small diversion did not alter the character of the benzol as military property shipped for a military and not a civil use. In explanation, the court simply stated that "In such a crisis, little importance is attached to the fact" of the diversion, and that "Stockpiles amassed by the Army and Navy in the defense of the nation are not to be scrutinized with a microscope when we seek to arrive at the general purpose of their accumulation." Since benzol under these circumstances is also fungible property, the principle announced collides with the ruling in Pennsylvania Railroad Company v. United States, supra, and the latter is elected to govern.

Plaintiff correctly contends that it is error to apply the standards of the Renegotiation Act to ascertain whether property is military or civilian under the Transportation Act of 1940. They have not been. The statistics provided by the steel companies to the renegotiation authorities are used here as a device of convenience, since the record shows that, despite the statutory standards of segregating renegotiable from nonrenegotiable contracts under the Renegotiation Act, the basis used by Inland Steel Company and Granite City Steel Company was the division between military and civilian production reported monthly to the War Production Board. It is reasonable to conclude that the distinction intended by the Transportation Act of 1940 between military and civilian property is coextensive with the separation between the two in the War Production Board production directives and the reports made thereunder. Since the percentages reported by the steel companies to the renegotiation authorities strictly reflect the data in their reports to the War Production Board, they are adopted as controlling here.

Accordingly, plaintiff is entitled to payment for its transportation services at land-grant rates on 63 percent of its shipments of scrap steel to Inland Steel Company during 1944 and 47.151 percent in 1945, and at commercial rates on 37 percent of its shipments during 1944 and 52.849 percent in 1945. It is also entitled to payment for its transportation services at land-grant rates on 60.4 percent of its shipments of scrap steel to Granite City Steel Company during 1944 and 65.9 percent in 1945, and at commercial rates on 39.6 percent of its shipments during 1944 and 34.1 percent in 1945.