Per Curiam
; This case was referred by the court pursuant to Rule 45, to Mastin G. White, a trial commissioner of the court, with directions to make findings of fact and recommendations for conclusions of law. The commissioner has done so in a report filed February 23,1960. Briefs were filed by both parties, exceptions to the commissioner’s findings were taken by the plaintiff, and the case was submitted to the court on oral argument by counsel. Since the court is in agreement with the findings and recommendations of the trial commissioner as hereinafter set forth, it hereby adopts the same subject to certain changes which have been made as the basis for the judgment in this case. Plaintiff is therefore entitled to recover $292.07 and defendant is entitled to recover on its counterclaim against plaintiff the sum of $1,454.36, which sums are to be offset one against the other. Judgment will therefore be entered for defendant against the plaintiff in the amount of $1,162.29.
It is so ordered.
OPINION OP THE COMMISSIONER
The court is called upon in this case to decide a controversy that arose out of the transportation by rail in 1944 of a number of carloads of Government-owned synthetic rubber, steel billets, and coiled steel rods. The shipments in ques *31 tion moved under Government bills of lading from various points in the United States to Savannah, Georgia, for export to the United Kingdom. The synthetic rubber, steel billets, and coiled steel rods involved in the shipments had been procured by the Treasury Department and were in the process of being furnished to the United Kingdom by the United States under the Lend-Lease Act of March 11,1941 (55 Stat. 31; 22 U.S.C., 1940 ed., Supp. 1,411 et seq.).
The carriers’ freight charges on the shipments mentioned in the preceding paragraph were billed to the Government by the plaintiff, as the delivering line, on the basis of the commercial rates; and the amounts billed were paid by the Government. Subsequently, the Government demanded that the plaintiff refund the difference between the freight charges as paid and smaller amounts which the Government regarded as proper on the basis of land-grant rates. The plaintiff declined to make the refund, whereupon the Government at various times in the 1950’s, under the purported authority of Section 322 of the Transportation Act of 1940 (54 Stat. 898, 955; 49 U.S.C., 1940 ed., 66) ,[1] made deductions from other bills of the plaintiff (the correctness of which was not in dispute) for the purpose of recouping the alleged overpayments on the shipments previously mentioned.
The plaintiff seeks in the present action to recover the amounts deducted. The Government, on the other hand, is endeavoring by means of a counterclaim to complete the process of recoupment.
As of 1944, with respect to the carriers that handled the shipments with which we are concerned, the requirement under the Act of June 7,1924 (43 Stat. 477, 486; 10 U.S.C., 1940 ed., 1375), and related equalization agreements, that railroads transport Government-owned property at reduced land-grant rates had been limited by Section 321(a) of the Transportation Act of 1940 (54 Stat. 898, 954; 49 U.S.C., 1940 ed., 65) to the transportation of “military or naval property of the United States moving for military or naval *32 and not for civil use.”[2] Therefore, the question to be decided in this case in whether the synthetic rubber, steel billets, and coiled steel rods mentioned above were within or outside the category of “military or naval property of the United States moving for military or naval and not for civil use.” If such commodities were within that category, the plaintiff overcharged the Government when it collected on the basis of the commercial rates for the transportation of the commodities, and the Government acted properly in attempting to recoup the overpayments. On the other hand, if the commodities in question were outside the category of “military or naval property of the United States moving for military or naval and not for civil use,” the commercial rates were applicable, and the Government acted improperly in making deductions from subsequent bills of the plaintiff on the ground that the charges for the transportation of the synthetic rubber, steel billets, and coiled steel rods should have been based on land-grant rates.
Although the form of the present action is one to recover the amounts of the deductions that were made by the defendant in the 1950’s from bills of the plaintiff that have not been questioned by the defendant with respect to their correctness, the substance of the controversy relates to the plaintiff’s charges for the transportation in 1944 of the synthetic rubber, steel billets, and coiled steel rods previously mentioned. Normally, the plaintiff has the burden of establishing the correctness of transportation charges. United States v. New York, New Haven & Hartford Railroad Co., 355 U.S. 253 (1957).
There may be some exceptions such as the case in which the relevant facts or the sources of such information are peculiarly within the possession of the defendant and are inaccessible to plaintiff. However, in view of the wartime conditions and the fact that all-out war was being conducted by both this country and Great Britain it would have been difficult for either party to have traced the use of every pound of rubber. A conclusion must be drawn from the *33 known facts construed in the light of the then prevailing conditions.
It will be noted at the outset that the quoted statutory provision preserved the land-grant rates with respect to— and only with respect to — “military or naval property of the United States,” and then only if such property was “moving for military or naval and not for civil use.” Hence, the scope of the statutory provision was restricted both by (1) the nature of the property shipped, and (2) the use to which the property was to be put at the end of the transportation. United States v. Powell, 330 U.S. 238, 242 (1947). However, these two criteria were closely interrelated because, in general, the use to which property was to be put was the controlling test of its military or naval character, i.e., it was the relation, in a case such as this, of a shipment to the military or naval effort that was controlling under Section 321(a) of the Transportation Act of 1940 (as that section stood in 1944). Northern Pacific Railway Co. v. United States, 330 U.S. 248, 254-255 (1947).
When consideration is given to the evidence bearing on the problem before the court relative to the nature of the property involved in these shipments, perhaps the first point to be considered is that each of the bills of lading covering these shipments bore the notation “For Export Military DA [Defense Aid],” thus indicating that the Procurement Division of the Treasury Department, as the procuring and shipping agency, regarded the commodities involved in the several shipments as military property. However, it is doubtful whether the unilateral declaration on the part of the administrative agency of the Government that the property involved in each of the shipments was “military” in nature was sufficient in itself to establish finally the actual nature of such property. Chicago and North Western Railway Co. v. United States, 129 C. Cls. 439, 442 (1954).
On the other hand, the fact that the commodities involved in this case were procured and shipped by a civilian agency of the Government, rather than by the Armed Forces, is not determinative of the question whether the commodities constituted “military or naval property.” The 1944 version of Section 321(a) of the Transportation Act of 1940 did not *34 make any reference to specific agencies or departments of the Government. However, whether the procuring and shipping agency was a civilian agency, on the one hand, or a military or naval agency, on the other hand, is entitled to special consideration, and might be decisive in a close case. Northern Pacific Railway Co. v. United States, supra, at p. 253.
Next, the evidence shows that the commodities with which we are concerned — synthetic rubber, steel billets, and coiled steel rods — did not themselves constitute military or naval equipment or materiel. They were industrial goods, and further manufacturing or processing would be necessary before they could be converted into consumption goods of any sort, whether for “military or naval” use or for “civil” use. However, the fact that further manufacturing or processing was required in order to convert these commodities into consumption goods would not take such commodities outside the category of “military or naval property” if they were to be manufactured or processed into equipment or materiel for the Armed Forces. In such a situation, the dominant purpose for which the manufacturing or processing activity was to be carried on would be controlling. Northern Pacific Railway Co. v. United States, supra, at p. 255.
Also, the fact that the commodities involved in the 1944 shipments were destined for use by the United Kingdom, and not by the military or naval forces of the United States, would not necessarily take these commodities outside the category of “military or naval property of the United States moving for military or naval and not for civil use.” The military and naval efforts of the United Kingdom, and of our other allies, during World War II were of great importance to the defense of this country; and military or naval materiel transported by rail during the war in connection with the delivery of such materiel by the United States to allied Governments under the Lend-Lease Act was entitled to the reduced land-grant rates under Section 321 (a) of the Transportation Act of 1940. Southern Pacific Co. v. United States, 107 C.Cls. 167, 176-177 (1946), cert. denied 330 U.S. 833.
*35 We know tbat the United Kingdom, in requisitioning the synthetic rubber under the Lend-Lease Act, stated that the rubber was needed for “Army and Essential Civilian” use, and that the tires and other rubber goods manufactured from the synthetic rubber would be “released only to the Armed Forces and for other purposes essential to the war effort.” Also, we know that the United Kingdom, in requisitioning the steel billets, stated that they were needed for the use of “Army, Navy, Air & other Government Agencies,” and that the articles to be manufactured from this steel would be “used in the United Kingdom for purposes absolutely essential to maintain the maximum war effort.” In addition, we know that the United Kingdom, in requisitioning the coiled steel rods, stated that they were needed for the use of “Army, Navy, Air & Other Govt. Agencies.”
Furthermore, it is known generally that in 1944 the United Kingdom gave top priority to the war effort over everything else, and that most of the commodities which the United States furnished to the United Kingdom under the Lend-Lease Act were ultimately used by the Armed Forces of the United Kingdom. Then, too, it is shown by orders, legislative enactments, and executive decrees, of which we may take judicial knowledge, that there was a tremendous shortage of rubber in the United States and the United Kingdom; that the sources of supply were in the hands of the enemy; that we were using tremendous quantities of wheat and sugar, both of which were in short supply, to make industrial alcohol for use in making synthetic rubber ; that a rubber czar was appointed to head an organization whose sole duty was to produce synthetic rubber in an effort to relieve the shortage; that rubber was treated as an essential, in fact a vital, war material; that it was rationed, and that it was next to impossible to secure any allotment of rubber except when to be used for war purposes.
Steel was likewise in short supply, its use completely controlled and it was an essential war material.
These recited facts when laid alongside the recitals in the transportation documents and requisitions preclude any other reasonable conclusion than these shipments were moving *36 primarily, in fact almost exclusively for essential military or naval purposes, and not for civilian use. We so find.
The defendant did not completely recoup the overpayments that it made in connection with the shipments of synthetic rubber, and it is entitled to recover the sum of $1,454.36 on its counterclaim respecting these shipments.
The parties have agreed, in connection with certain other shipments not discussed in this opinion, that the plaintiff is entitled to recover the amount of $292.07. Therefore, the defendant is entitled to a judgment for the net sum of $1,162.29.
FINDINGS OF FACT
1. The plaintiff is a corporation organized and existing under the laws of the State of Georgia. It is a common carrier of persons and property for hire in both interstate and intrastate commerce.
2. On various dates during the period 1943-1945, the defendant, acting through the Procurement Division of the Treasury Department, shipped or caused to be shipped by rail, on Government bills of lading, from various points in the United States to itself at Savannah, Georgia, for export, and also to Montgomery Alabama, for transit and subsequent movement to Savannah for export, a substantial number of carloads of Government-owned commodities, including synthetic rubber, steel billets, and coiled steel rods.
3. The carriers’ freight charges on the shipments mentioned in finding 2 were billed to the defendant by the plaintiff, as the delivering line, on the basis of the commercial rates; and the amounts billed were paid by the defendant. Subsequently, the defendant demanded that the plaintiff refund the difference between the freight charges as paid and smaller amounts which the defendant considered to be proper on the basis of land-grant rates. The plaintiff declined to make such refund, whereupon the defendant at various times in the 1950’s made deductions from other bills of the plaintiff against the defendant (the correctness of which was not in dispute) for the purpose of recouping the alleged overpayments. The plaintiff thereafter instituted the present action to recover the amount deducted.
*37 4. With the exception of bills Nos. 24457, 24865, 32295, 37011, 29248, 33212, 40155, and 31136, all the bills listed in Schedules A and B attached to the plaintiff’s petition have been withdrawn by the plaintiff, which makes no further claim respecting the withdrawn bills.
5. The parties have agreed that the plaintiff is due the total amount of $292.07 on the following bills:

Bill No. Amount Due

24457 _$29.32
24865 _ 19.78
37011 _135.74
29248 _ 23.75
40155 _ 83.48
292. 07
6. The plaintiff’s bills Nos. 32295, 33212, and 31136 are the only ones that remain in dispute. The sole issue to be decided by the court in connection with these bills is whether the property covered by the bills of lading involved in these particular transactions was within or outside the category of “military or naval property of the United States moving for military or naval and not for civil use.”
7. (a) The plaintiff’s bill No. 32295 covered 14 shipments of synthetic rubber that moved during September 1944 from Lake Charles, Louisiana, to Savannah, Georgia, for export to the United Kingdom. Each of the 14 bills of lading carried the notation “For Export Military DA [Defense Aid],” and also the notation “Eeq. 21517.” The latter notation was a reference to Eequisition For Defense Articles No. BSC/ 21517, under which the United Kingdom requisitioned, and the defendant furnished to the United Kingdom, a quantity of synthetic rubber pursuant to the Lend-Lease Act of March 11,1941 (55 Stat. 31; 22 U.S.C., 1940 ed., Supp. 1,411 et seq.).
(b) (1) Eequisition No. BSC/21517 stated in paragraph 2-C that the requisitioned synthetic rubber was for “Army and Essential Civilian” use.
(2) Paragraph 5-B of this requisition stated in part as follows:
This material appears in the U.K. Civilian Eequire-ments Programme * * *.
*38 (8) Paragraph 5-C of this requisition stated in part as follows:
All of this material is required for the manufacture of tires and essential rubber goods. Production and distribution in the U.K. is held under strict control by the U.K. Rubber Control, and tires and other fabricated rubber goods are released only to the Armed Forces and for other purposes essential to the war effort. * * *
(c) If the court concludes that the synthetic rubber involved in the shipments covered by bill No. 32295 was outside the category of “military or naval property of the United States moving for military or naval and not for civil use,” the plaintiff is entitled to recover the sum of $1,618.37 in connection with these shipments. On the other hand, if it is concluded that the synthetic rubber was within such category, the defendant is entitled to recover the sum of $1,454.36 on its counterclaim respecting these shipments.
8. (a) The plaintiff’s bill No. 33212 covered a shipment of steel billets originally shipped from South Duquesne, Pennsylvania, on September 23,1944, to Shreveport, Louisiana, for holding and reconsigning. Thereafter, on October 31,1944, the shipment was forwarded to Savannah, Georgia, for export to the United Kingdom. The bill of lading covering the movement from Shreveport carried the notation “For Export Military DA,” and also the notation “Req. 20925-T-8,” which was a reference to Requisition For Defense Articles No. BSC-20925, under which the steel was furnished to the United Kingdom by the defendant pursuant to the Lend-Lease Act.
(b) (1) Paragraph 2-C of Requisition No. BSC-20925 stated that the steel was for the use of “Army, Navy, Air & other Government Agencies.”
(2) Paragraph 5-C of this requisition stated (among other things) that:
It is impossible to specify precisely the purposes for which articles to be manufactured from this steel will be used, except to state that these articles will be used in the United Kingdom for purposes absolutely essential to maintain the maximum war effort.
(3) Paragraph 5-1 of this requisition stated in part as follows:
*39 This steel is intended for distribution to manufacturers in the United Kingdom through the British Iron and Steel Corp., which performs the service as a Government Agent without compensation. * * *
(c) If the court concludes that the steel billets involved in the shipment covered by bill No. 33212 were outside the category of “military or naval property of the United States moving for military or naval and not for civil use,” the plaintiff is entitled to recover the sum of $183.75 on this particular claim. However, if it is concluded that the steel billets were within such category, the plaintiff has been paid in full and is due nothing on this claim.
9. (a) The plaintiff’s bill No. 31136 covered 8 shipments of coiled steel rods that moved from Sparrows Point, Maryland, in April 1944 to Montgomery, Alabama, and were thereafter forwarded to Savannah, Georgia, for export to the United Kingdom. The bills of lading carried the notation “For Export Military DA,” and contained either the symbol “19807/DA/T-7” or the symbol “19807/DA/T-8,” indicating that the coiled steel rods were furnished to the United Kingdom by the defendant under Requisition for Defense Articles No. BSC/19807/DA/T-7 or No. BSC/ 19807/DA/T-8 pursuant to the Lend-Lease Act.
(b) Requisitions Nos. BSC/19807/DA/T-7 and BSC/ 19807/DA/T-8 contained an identical paragraph 2-C stating that the steel rods were to be for the use of “Army, Navy, Air & Other Govt. Agencies.”
(c) If the court concludes that the coiled steel rods involved in the shipments covered by bill No. 31136 were outside the category of “military or naval property of the United States moving for military or naval and not for civil use,” the plaintiff is entitled to recover the sum of $873.91 on the basis of these transactions. However, if it is concluded that the coiled steel rods were within such category, the plaintiff has been paid in full and is due nothing on these particular claims.
10. (a) In testifying before the Subcommittee of the Committee on Appropriations of the House of Representatives on the Defense Aid (Lend-Lease) Supplemental Appropriation Bill, 1943, the Honorable E. R. Stettinius, Jr., Lend- *40 Lease Administrator, stated (among other things) as follows regarding the purposes and goals of the lend-lease program:
To win this war against ruthless and powerful foes requires that we call upon the total resources in men and materials of the United Nations. Congress has affirmed that Lend-Lease is an essential military instrument for accomplishing that objective.
(b) In response to the question, “You are not concerned with civilian use at all?” from the Chairman of the Subcommittee, Mr. Stettinius stated as follows:
Except possibly a few of these tires might find their way into the automobile of the air raid warden or the doctor, or an ambulance, but there are no automobiles, as you know. There is no gasoline rationing in England. An individual cannot even get a license to operate his car unless he appears before a board and is given permission to run an automobile, and then he is allowed a small quantity of gas by special permission, and these tires will be handled exactly the same way. Motoring in England absolutely does not exist to the civilian population.
11. (a) The Honorable Leo T. Crowley, Foreign Economic Administrator, testified (among other things) as follows before the Subcommittee of the Committee on Appropriations of the House of Representatives on the Foreign Economic Administration Appropriation Bill for 1945:
The bulk of the United Kingdom’s requirements for tires and tubes is produced within the British Empire. Synthetic rubber will be required to utilize Britain’s tire-manufacturing facilities, which are presently turning out large airplane tires for the United States Army Air Forces as well as for the R.A.F. Funds are also requested for tires and tubes for combat vehicles and essential war transport to supplement British production. The rationing of tires for civilian use in Britain is much more severe than ha the United States, since no nonessential driving is permitted and the number of passenger cars in operation is 80 percent less than it was in 1940.
(b) A statement submitted by Clifton E. Mack, Director, Procurement Division, Treasury Department, at the same *41 bearing mentioned in paragraph (a) of this finding contained the following data:
UNITED KINGDOM
(45 percent of total lend-lease request)
Production. — In peacetime the United Kingdom was dependent upon foreign imports for a large portion of both its iron ore and steel. During the war the United Kingdom has been forced to rely on low-grade domestic ore and imports of steel from the United States in order to meet the war demands for steel. Despite these handicaps and interruptions due to blackouts and bombings, the British steel industry has succeeded in producing at about 91 percent of capacity.
Distribution and Government control. — -Due to the serious shortage of steel in the United Kingdom, it has been necessary to restrict consumption severely in all uses which do not contribute directly to the war effort. Since March 1940 a system of complete allocation of total available supply has been in force. This is administered by the Iron and Steel Control which is part of the Ministry of Supply. In 1944 total steel requirements of the United Kingdom as presented by the principal Government departments are divided as followS:

Percent

Navy — for constructions, repairs, conversions, guns, gun
mountings, etc_ 15.0
Merchant marine_ 6. 8
Air — aircraft, guns, bombs, etc_ 7. 5
Army — for armored, fighting vehicles, artillery, ammunition, wheeled vehicles, engineers stores and supplies_ 32. 0
Army — for construction of plants and machinery, shipyards, storage, and other buildings_ 14. 7
Other departments — including transportation, mining, electricity, gas, water, farm machinery, and miscellaneous- 24. 0
Total-100.0
Considering the shortage of these critical materials in the light of world-wide war conditions and the official steps that had been taken to channel the particular materials into war essentials, together with the recitals in the waybills with the other facts of record, we find that the primary purpose was war usage and that practically all and perhaps the entire shipments were military or naval property moving for military or naval use.
*42 CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover the sum of $292.07, to be set off against the recovery by the defendant on its counterclaim; and the court further concludes that the defendant is entitled to recover the sum of $1,454.36 on its counterclaim. The amount of the plaintiff’s recovery being set off against the amount of the defendant’s recovery, it is adjudged and ordered that the defendant recover of and from the plaintiff the sum of one thousand one hundred sixty-two dollars and twenty-nine cents ($1,162.29).

 The original language of Section 322 remained in effect through the 1946 and 1952 editions of the united States Code and is still in effect, but other material was added to the section in 1958 (49 U.S.C., 1958 ed., 66).

 Section 321(a) was revised effective October 1, 1946, by tbe Act of December 12, 1945 (59 Stat. 606). However, that occurred after tbe plaintiff, and its connecting railroad lines, bad transported tbe shipments that are involved in tbe present case.